Good morning, Martin Weidner, along with Kimberley Holman, I'm the director of the U.S. Department of Commerce, and on behalf of the appellant, Mitt Kanodia, may we reserve two minutes for rebuttal? Yes. This is an insider trading case that was prosecuted solely on a misappropriation theory of criminal liability, which in turn required that the government prove that Mr. Kanodia owed a duty of trust and confidence to his wife, Mr. Sue, who was a lawyer for one of two companies engaged in a merger and acquisition in June of 2013. Judge Gordon, consistent with the instructions that were mentioned by this court in United States v. McPhail, provided two alternative bases for the findings of this duty of trust and confidence. One, on whether or not there was proof Mr. Kanodia agreed to keep or maintain a duty of confidence. Unlike the record in McPhail, where the insider testified that there was an agreement to maintain the confidence, here Ms. Sue did not testify, and there was no other evidence that Mr. Kanodia agreed with her, or even that she requested that he agree to maintain the confidence of whatever information she was conveying to him, and he in turn was shown to convey to the two traders. The second alternative option of proving the misappropriation theory's duty of trust was proof that there was a pattern, a history, a practice between the two parties, Mr. Sue the insider, Mr. Kanodia the intermediary, that would in turn show Mr. Kanodia that his wife had a reasonable expectation that he would maintain the privacy of these communications. There again in McPhail was evidence that they had, through the years, the two friends had discussed confidential business information, and that the insider had imposed on the intermediary, his friend McPhail, a duty of confidence that McPhail had agreed to. Here there was no such evidence, no evidence that these two parties had any prior history of exchanging confidential business information that would allow Mr. Sue to assume that Mr. Kanodia would maintain the confidence of whatever she told him. To the contrary, the strongest circumstantial evidence that there was no duty of confidentiality, that Mr. Sue didn't have a reasonable expectation of confidentiality, that Mr. Kanodia would not divine that confidentiality duty, was seven defense witnesses. Credible businessmen from India, an attorney from the United States, who uniformly testified that Mrs. Kanodia and Ms. Sue, despite her role as an attorney for a company, was openly bragging, they said, openly discussing the fact that her company, Apollo, was going to acquire a United States company, Cooper's Tire, that she was in New York, that she was working on that acquisition. Mr. Kanodia was present during conversations in India with Mr. Panit, in India with Mr. Jane, in America with Mr. Dodd. He heard her, Ms. Sue, openly talk to these seven people, three of them he heard, without imposing a duty of confidentiality, without requesting that any of them maintain the confidence of the insider information she was providing to them, that she was in New York, as a lawyer, working on a future acquisition that was going to occur between her company, Apollo, and Cooper's Tire. It's simply, that evidence is the antithesis of a duty of confidentiality. Mr. Kanodia, who's not a lawyer, is hearing his wife, the lawyer, communicate to a variety of people, in a variety of circumstances, where others would deem confidential information. The government says that those disclosures were general, as opposed to specific. And they were. They did not include the seven witnesses who testified to conversations in February and April of 2013, did not testify to the price, did not testify to the date. There is a Rule 33 issue that I will address second, where the newly-discovered witnesses, in fact, were told by Ms. Sue, just the information that the seven defense witnesses at trial did not. But if Mr. Kanodia, who again is not a lawyer, does not know the contours of insider trading, hears his wife openly discussing even a general category of what would be insider information, that an acquisition is going to occur, that I, as the lawyer for the Indian Company, am in New York negotiating it, there's simply no evidence that would support the premise that he agreed to protect the June information, about price and date, where there was no evidence that he didn't agree in April or May. Again, Judge Gordon gave the jury just two premises to find this essential element. One, an agreement by Kanodia. There's no evidence he agreed to maintain confidentiality. And the second, in the language of the court, whenever the parties have a history, pattern, or practice of sharing confidences, such that the recipient, Kanodia, would know that Mr. Sue was communicating the information with an intent to maintain its confidentiality. Mr. Weinberg, what's wrong with that? That's long been the standard in the law. The SEC rule is the source of it. How did that mislead the jury? It didn't, Your Honor, and I'm not quarreling with the instruction. I didn't object to that instruction. What I am contending, however, is that that instruction provided two separate bases for the finding of criminal liability, and the government utterly failed to prove either. There was no evidence of a past history, pattern, or practice amongst these two people where confidential business communications were shared, such as the court relied upon in upholding the conviction of Mr. McPhail. The government points to the fact that he introduced his wife to his many business associates, and they argue that you can infer from the conduct surrounding those introductions and getting her business that that would be the evidence that supports the confidentiality. Indeed, there was evidence that Mr. Kanodia introduced her to potential clients or potential legal opportunities, but no evidence that would transform that kind of entrepreneurial networking into a history where they were conveying confidential information, where Ms. Kanodia ever before told him anything in confidence, any secrets, anything about the content of her legal work. He could well have introduced her to a client, but there was no evidence that after the introduction, Mr. Sue ever conveyed to him the content of any privileged legal information that she was working on. And here at the one time that there was such evidence, she is busy openly bragging to people, including people in his presence, including people he introduced her to, like Mr. Malapiti in India, Mr. Paneet, Mr. Jane, all the witnesses we brought. That would send a message that would be the antithesis of Mr. Kanodia believing that his wife wanted to impose a duty of confidentiality. But what about the fact that he himself was an entrepreneur with an MBA and the suggestion, at least, that that puts him in a position of knowing that she owes a duty of confidence to Apollo and the fact that she perhaps wrongfully shared the detailed information with him helps to establish a duty for him not to further release that information. And that would contain Judge Howard that had he owed a duty to Apollo or Coopers, that that would have been a duty that was breached. But his only duty was to her and when she is busy openly discussing what she should have preserved because she had the duty to Apollo, he is simply under no duty or derivative duty to Apollo. His sole duty would be to maintain a confidence that his wife would reasonably expect him to maintain, but she couldn't reasonably expect him to maintain a confidence that he saw her or heard her disclosing openly at parties and business meetings. Would you think that same principle would apply to an acknowledged, admitted, true financial advisor, confidential advisor, a lawyer? Regardless of whether the client may be disclosing that information, doesn't the professional still have the obligation not to further use it? Yes, Mr. Sue had the obligation to further use it, but Mr. Canote had no obligation to Mr. Sue's clients. And if he were a professional confidential advisor, he would not have that obligation to use it? He wasn't a professional confidential advisor. I know I'm asking you hypothetically, do you think the rule would apply the same? Were he a true professional confidential advisor? Not unless he was a confidential advisor to the company that had the right to the confidence of both the advisor and the lawyer. But the advisor to the lawyer would not have a duty to maintain a confidence unless they had some fiduciary relationship, which is absent on the record of this case. Clearly, if I'm the lawyer and I have an advisor, that advisor owes the duty to the company, just like if I hired an expert or an investigator. I'm positing the person I want to put in place of Canote is a confidential, someone who you acknowledge is a confidential advisor to Basu. I would contend that that would provide a duty not to Basu, who was busy openly discussing things in his presence. It would make him an agent of Basu's relationship. It would make him have a responsibility to Apollo or the company or the client of the lawyer not to repeat information. But again, introducing people, which is the best evidence the government had that he introduced her to clients and introduced her to business opportunities, I would contend is separate from any evidence that was not produced here. That he was a financial advisor to her in a manner that conferred confidentiality or fiduciary-like obligations to either her or her clients, in this case, Apollo. The government is also suggesting that Mr. Canote and the people who received the information attempted to keep it quiet, that they took steps to hide the fact that they had received the information. That's pretty powerful evidence that they knew they were engaged in wrongdoing. And you've not mentioned that, so what is your reply to that? My reply to that is certainly Mr. Canote and Mr. Watson even surmise that Mr. Canote might be concerned that if he traded the stock, he could fall within the radar of the regulators. But that fear, that anxiety that's reflected by Mr. Canote's caution, his not openly giving this information to ten people rather than two people, is consistent with Mr. Canote's concern that he might fall within the radar of a regulator. But it's not based on an agreement with Ms. Basu. And the second premise of a duty that was under the instructions of McFarlane and Judge Gordon was that it had to be predicated on a past history pattern or practice between the insider, Mr. Basu, and Mr. Canote. Mr. Canote's anxieties, his fears, his concerns, his using safety, his keeping it to two people, simply can't be extrapolated into the predicate for the duty of confidence, which is a past history pattern or practice. Thank you. Good morning. May it please the court, Dave Lieberman for the United States. We ask that the panel affirm the convictions below. I'll start with the issue that opposing counsel led with, the sufficiency claim. Does this record reasonably support the inference that Canote had been informed or otherwise knew that he was not allowed by his wife to pass along the merger information? The answer to that question is yes. And I'd like to reference two buckets of evidence that support that. The first point, I'll start off with Judge Lynch's question. I'd ask the court to look at Canote's statements to Watson, one of his best friends who he tipped. This is at Joint Appendix 194 through 199. Canote tells Watson. What is the evidence of their history of having a confidentiality relationship since I think you can see that marriage alone isn't enough? This goes to my second bucket of evidence, which I'll address. Marriage alone is not enough. But as the district court instructed, it can be considered in the overall equation as to whether or not these two individuals have a course of conduct, whether it is a duty or an expectation of confidentiality. So in addition to marriage, these individuals were actively involved in each other's professional careers, helped each other out. And also recall that Canote is specifically aware of his wife's ongoing role in the merger process, in the due diligence process, both of which are confidential. So that itself shows that he is actively hearing and receiving these confidences. So we also remember, Your Honor, that Mr. Canote is there on the ground in New York City with Basu as she is participating in this confidential due diligence exercise. He is there in the hotel room. She is bringing merger documents back to the room. And from these... What about these witnesses who say she was spouting off about the merger? Those were defense witnesses. And I have a goal point and a specific point. My broad point is that was evidence that the defense brought from those witnesses into the defense side of the case. The jury was free to give whatever weight or credibility to those witnesses. The jury was not obligated as a matter of law to accept the defense narrative that they produced through those witnesses. And second, as the prosecutors pointed out at trial, the evidence or the information that Canote had was much more detailed than the generalized information that the defense witnesses spoke about. So for either of two reasons, one, the jury was free to disbelieve these witnesses. It was contradicted evidence. We leave it to the jury to sort out. And two, we gave the jury, in fact, a reason to conclude that those witnesses did not defeat the duty of confidentiality. I think you didn't get to finish your first point. Yes, Your Honor. So looking at pages 194 to 199 of the joint appendix, specific statements by Canote to Watson. Quote, Basu is involved in the merger negotiations. Quote, I cannot buy the stock because of her position as general counsel. Quote, I am only going to offer this information to my two best friends. And when Canote starts offering this information, he prefers face-to-face communications and telephone calls, not emails, because we don't want to be a paper trail. We don't want anybody to know we're doing this. So what did these statements entail? What could a jury reasonably infer from them? Canote knew that this information was, in fact, sensitive, was, in fact, confidential. He knew that it was related to an insider trading prohibition. He knew he was not supposed to be disseminating it publicly. These are self-imposed restrictions on his own use and his own communication of the merger information. If he legitimately thought that he was under no expectations of confidentiality when he received this information from his wife, all of these self-imposed restrictions would have been gratuitous. The jury, quite reasonably and already readily, saw his actions for what they were. Basically, through his conduct in a statement to admissions, that he understood the information that he received from his wife, he was supposed to keep it secret. So combined those specific statements that Canote made to his best friend, Watson, about his own views, his own characterizations of the merger information, with the more general context in which he received the information. In the marriage, where they are exchanging professional confidence, where they are involved in each other's careers, and where Canote is on the ground in New York City as his wife is engaged in this very sensitive process. And the jury could rightly infer, reasonably infer, that any confidences exchanged during this period, like with many marriages, carried with it the expectation of confidentiality. So these two buckets of evidence, considered in their totality, reasonably supports the jury's finding that Canote received the merger information from his wife with the understanding that it was confidential, that it was not supposed to be shared with the world. Could you move on and address the request and the decision by the trial judge to deny a use instruction? Yes, Your Honor. And we're well aware of your argument that it's harmless error if there was an error. But I'd like to know your views on whether it was error in this type of case. I don't believe it was error. So if everybody is in agreement about the general definition of what insider trading is under Section 10b, a person violates that statute if he trades on the basis of material, non-public information. In the 1990s, courts had a dispute about what does insider trading mean. The 9th and 11th Circuits said the government has to prove affirmative use by the trader. The 2nd Circuit said that doesn't make sense to us. A person who normally conducts a trade with an awareness or possession of the information, that's insider trading. The SEC studied... Go back. What was the 2nd Circuit's reasoning? The 2nd Circuit's reasoning is that if the trader has inside information in his head... Of course, here, he's not actually trading. He's passing on the information to others who trade. Right. So it would be, in this case, as the District Court instructed, we would be looking at what was in the minds of the friends, Watson and Ahmed. But the 2nd Circuit's reasoning was... The District Court did instruct that? So the District Court, at least my notes have it, in the instruction referenced whether his friends were in possession of the merger information that they received from Canodia. And that's just in possession of... Correct. I thought you referenced and they traded based on that possession. So the District Court, following the 2nd Circuit's reasoning, said trading on the basis of information means normally conducting trades while in possession of the information, while aware of the information. That was the 2nd Circuit's definition. That is the definition that the SEC adopted in 2006. That's okay. Let's go back to my... Why did the 2nd Circuit come up with that? So the 2nd Circuit's view was that if you trade in possession of information and awareness of information, it is inevitably influencing your decision. So it is, in fact, taking this notion of use off the table. Now, I think that's perfectly permissible. The Supreme Court in O'Hagan says the SEC gets to define the content of what insider trading... Certainly in civil cases that's true, but this is a criminal prosecution. And O'Hagan was a criminal case, that Supreme Court case, and in that decision, that criminal case, the Supreme Court said the SEC rule gets control and weight unless it is arbitrary, capricious, or manifestly contrary to the statute. Kennedy has made no such contention here. He does say that Chevron should not apply because this is a criminal case. The government's response is the Supreme Court addressed that and rejected that position in the O'Hagan case. And the other argument that I believe opposing counsel makes is, well, this is creating an improper presumption or changing the mens rea. In SEC, the rule, 10b-5-1, it's not creating a presumption. It's not changing knowledge or willfulness and bumping it down to a negligent standard. The SEC promulgated a rule explaining the specific or outlining the boundaries of the deceptive practice prohibited by Section 10b. Congress gave that responsibility to the SEC in Section 10b itself. And we know that the Supreme Court in O'Hagan said that was appropriate and courts should afford that control and weight. The one circuit that has looked at Section 10b-5-1 after 2000, the Second Circuit in the Royer case, said we defer to that. Yes, but Judge Rakoff also says not only do we defer to that, but we defer to the reasoning of the prior Second Circuit case. And it becomes a bundle of reasons. And I'm actually trying to tease out what those reasons are. So the reasons are, in defining insider training, the Second Circuit said it doesn't make sense to us, as I understand their opinions, to have the government prove use. Once somebody has something in their head, they can't unthink it. And once a trader has insider information in his head, we go back to the formulation, the classic formulation of insider training. You either disclose or abstain. And that was the basis of the Second Circuit's decision there, going back to a long line of Supreme Court cases that said somebody who has insider information must disclose or abstain. There is no third option. And that's how the Second Circuit came up with that. And I'll just flag that we do have our background harmless error. We think we have strong arguments there. Before you get to that, theoretically, though, there might be knowledge without use, even if you do make a trade. And it seems to me that there is some risk in an instruction that says, knowing possession is all that needs to be proven. I mean, it's one thing to say that a jury could infer from that that it was used. But if you create sort of this mandatory presumption, then that seems to me now you're getting in the world of affirmative defenses and shifting burdens. And why would you want to do that? Why wouldn't the instruction just be that you can infer from that evidence, as opposed to that's enough? So I want to dispute that it is effectively a mandatory presumption, at least in the SEC's view, that it's not a mandatory presumption. This is, in fact, the legal act of being aware of the information while trading on it. And going back to that classic formulation, you either disclose or you abstain. The third option is prohibited. So why wouldn't the instruction be that he, Kenodia, either had to disclose or abstain? I'm also a little nervous about this lack of a use instruction. If it were tied to the classic duty that preexisted the rule, it might be somewhat easier to comprehend. I understand, Your Honor. So my best answer is this is the rule that the SEC, after consideration, came up with. Courts afford the governing weight. But if the court is concerned about wading into this bog, it can just shift its attention to harmless error. Yeah, but, you know, sometimes the law needs to be made. Sometimes the district courts need to have an answer from us on what the correct instruction is, especially since our last two cases have raised some glimmers of doubt. I understand, Your Honor, and the government's view is that the position of the SEC and the position of the Second Circuit is the correct and the governing rule. So whether we think it's the wisest approach or not, we have to defer to it. I think that's what O'Hagan instructs, that it is the, quote, controlling weight unless it is arbitrary, capricious, or manifestly contrary to the statute. And that standard has not been met here. And, of course, any alternative? We think the government has shown ample evidence that Watson and Amed actually used that. Watson formally testified to that fact. His conduct, both of their conducts support this testimony. They were buying very risky option contracts weeks before the merger announcement, and then phone records show Kenodia speaking. Okay, you're running out of time. What about the new trial motion? Forget the newspaper articles. Focus on the new witnesses. The new witnesses. So the new witnesses, so Kenodia still had, there was no visa discretion. Kenodia still had two key pieces of information that the effigies did not. First, he understood uniquely the reliability of Basu's information because he had been following her involvement in the process for a matter of months, and he knew the precise date of the merger announcement. And that was critical to the success of this scheme. Watson joined Appendix 229. Watson testifies why that date is important. They want to buy cheap option contracts shortly before the announcement date. Then the market will, the price will go up and they will quickly sell off their position. Are you saying none of the new witnesses got information about the precise date of the merger? They had only information, broadly speaking, that would incur in the next couple of weeks or sometime in June, and contrast that with the information that Watson and Ahmed had. If I could just complete Judge Lynch's question. Yes, go ahead. Ahmed, this is also shown in Appendix 489. Mr. Ahmed is buying option contracts in a narrow two-week window. Tell me what the material difference is between the information that Watson had and the information that Sanjay Kumar and Vivek Singh had. So the specific information is June 12, 2013. He has the exact date of the merger announcement. And that's material because? That's material because under this scheme, Watson and Ahmed were purchasing very risky option contracts days before the merger announcement. The plan was to buy them right before the announcement date, have the market float up, and immediately sell off the position. This is also Joint Appendix 489. Ahmed is buying option contracts just two weeks before. He has a two-week window for the price to go up or the options will become worthless. And that was central to this scheme. And that merger date is something that Kanodia had and the Nafians did not. The new trial motion asserts that at least one of the new witnesses was told the total value of the deal and that you could work backwards from that to what the price per share would be. I agree with that interpretation. Yes, Your Honor. Well, that's interesting because you had a witness at trial that disputed that. You're not disputing it now? I'm not disputing that the witnesses said that they could extrapolate. It was on the paper, so we're taking the witnesses at face value. But the witnesses said based on what they had read in their discussions with Basu, they could extrapolate backwards the total price of the merger. The thing that they did not have was the announcement date. And if I could just make one more point before I sit down. This was done on the papers. If the court agrees that Mr. Kanodia has, in fact, made a factual predicate, the only error here was that the district court wrongly denied it on the papers. We would ask that this court then remand for an evidentiary hearing for these witnesses to come in and for the district court to make fact findings and credibility determinations. Unless there are any more questions or concerns, the government asks that this court affirm. Thank you. Very briefly, in terms of the neutral motion, the options that were the predicate for the convictions, Mr. Ahmed, his options expired two weeks, June 22, or ten days after June 12, or within the couple of weeks or shortly that both two of the four newly discovered witnesses, both attorneys in India, would testify. Ms. Basu said to them in June the deal was closing. It was closing in a few weeks. It was closing very shortly. Mr. Watson's options closed in July or August, meaning that even if the announcement occurred in July or early August, his options would still be within the money. So there was no need for a specific June 12 date. That was not special. What was important is that the merger was occurring and would close within the period of these options, and then they all testified to the $2.5 billion. Why isn't that evidence for the government? If they deliberately set the options for a period beyond the actual date of the transaction, maybe they look a little more innocent when they know that they shouldn't be doing this at all. Again, it goes to two things. One is the materiality of the new witnesses' testimony. They didn't need to testify. Ms. Basu said the announcement was occurring June 12. She said enough about the imminence of the merger to make these witnesses material, important, not cumulative, and likely to lead to an acquittal. And second, it goes back to the duty of trust, which is that Mr. Kanodia could be saying things. And finally, the government conceded. They didn't argue these defense witnesses were not credible. During their final argument, they said the defense witnesses, and they adopted the testimony of the defense witnesses regarding Ms. Basu's disclosures, and then they argued, but her disclosures were not specific enough to rationalize the options, the precise dividing line that these four new witnesses would have addressed would a new trial be permitted. Thank you. Thank you very much.